IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Bernard Ceasar and Tawanda Taylor-White, Plaintiffs, <br><br> vs. <br><br> Access Community Rehabilitative Behavioral Health Services and Jembralyn Jones, individually and as a managing agent of Access Community Rehabilitative Behavioral Health Services, <br><br> Defendants. | C.A. No. 3:17-cv-466-JFA <br><br><br> **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT AGAINST DEFENDANTS ACCESS COMMUNITY REHABILITATIVE BEHAVIORAL HEALTH SERVICES AND JEMBRALYN JONES** |

## I.     INTRODUCTION AND PROCEDURAL BACKGROUND

Bernard Ceasar and Tawanda Taylor-White ("Plaintiffs") filed this action against Access Community Rehabilitative Behavioral Health Services and Jembralyn Jones ("Defendants") alleging that Defendants failed to pay minimum wage and overtime, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C §201 et seq. Plaintiffs' Amended Complaints also assert causes of actions for violation of the South Carolina Payment of Wages Act (S.C. Code Ann. §41-10-10, et seq.) and common law breach of contract.

Access Community Rehabilitative Behavioral Health Services ("Access") is a South Carolina nonprofit corporation. Jembralyn Jones ("Jones") is its sole owner.[1]

Through counsel, both Defendants timely answered and essentially denied all the material allegations of the Amended Complaints. In particular, Defendants' answers asserted that both

---

[1] The exact relationship between Access and Jones was not clearly articulated in the pleadings or the testimony, but both sides conducted the trial as if Jones was the only owner and officer of Access. Jones clearly controlled all of the corporate records and bank accounts as well as the day to day operation of the business.

Plaintiffs were independent contractors and not employees, and, for that reason alone, Plaintiffs are not entitled to compensation for overtime work.

On July 25, 2018, at a hearing, this Court granted the Defense Attorneys' Motion to Withdraw as Counsel for both Access and Jones. This Court carefully explained to Defendant Jones that, under established Fourth Circuit law, a corporation cannot proceed *pro se* and allowed Defendant Jones 45 days to obtain counsel for her corporation. This Court instructed Defendant Jones to submit the name of new counsel in writing, if and when she obtained counsel for Access, to the Clerk of Court. Defendant Jones was further informed in person that if she failed to obtain new counsel for Access, the Court would be required to strike the answers filed by Access and a hearing would be held to determine damages. Defendant Jones failed to obtain counsel for Access as instructed by this Court. As a result, on September 25, 2018, Plaintiffs moved to strike the answer filed by Access and hold Access in default. Thereafter, on September 27, 2018, this Court held Access in default, struck its answers to Plaintiffs' Amended Complaints, and scheduled a damages hearing for October 16, 2018. (ECF No. 78).

Following the entry of default against Defendant Access, on October 16, 2018, this Court held an evidentiary hearing on damages. (ECF No. 79). Plaintiffs Ceasar and Taylor-White were represented at the damages hearing by Attorney Shannon Polvi of Cromer Babb Porter & Hicks, LLC. Although notified by the Clerk, neither Defendant appeared at the hearing. Plaintiffs Ceasar and Taylor-White both testified at the damages hearing. Plaintiffs also filed a Motion for Damages and Attorneys' Fees and Costs, which included an attorneys' fees and cost affidavit of Shannon Polvi. (ECF No. 82).

After hearing undisputed and unchallenged testimony at the damages hearing from both Plaintiffs, on October 23, 2018, this Court issued an order with findings of fact, conclusions of

law, and judgment against Defendants. (ECF No. 84). This Court held Defendants liable for damages in the amount of $75,899.16 to Plaintiff Bernard Ceasar and $35,461.16 to Plaintiff Tawanda Taylor-White. The Court also held Defendants liable for $26,560.83 to Plaintiffs collectively for attorneys' fees. As noted, neither Defendant attended the damages hearing and thus, this Court issued judgment against Defendants based on the uncontroverted evidence Plaintiffs presented to this Court at the damages hearing. Access and Jones were held jointly and severally liable under the FLSA. *See Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983) ("The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages.").

Subsequently, on November 1, 2018, Defendant Jones filed a Motion for Reconsideration of the Findings of Fact & Conclusions of Law and Judgment. (ECF No. 89). Plaintiffs responded in opposition. (ECF No. 90). The Court held a hearing on Defendant's Motion to Reconsider on December 11, 2018 (ECF No. 95) and thereafter granted Defendant's Motion for Reconsideration and vacated the Findings of Fact & Conclusions of Law and Judgment on Damages. (ECF No. 95).[2] Both parties then consented to a non-jury trial. (ECF No. 95).

---

[2] Jones contended that she never received notice of the damages hearing from the Clerk. That notice was sent to the same address used by Jones throughout this litigation, all of which Jones admitted she received. Nevertheless, out of an abundance of caution, and in an effort to be fair to both sides, the Court essentially decided to wipe the slate clean and start over. Also, because Jones is a named Defendant, entitled to represent herself and thus not in default, and because Jones could be personally liable, the Court advised the parties that the new hearing would involve disputed issues of both liability and damages. *See Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983) ("The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages.").

Thereafter, this Court held a four-day bench trial to determine liability and damages on all claims on December 21, 2018,[3] January 29-30, 2019, and April 18, 2019.

This Court originally concluded the bench trial after three days on January 30, 2019. However, on February 14, 2019, while this Court was attempting to decide the disputed facts in this case, the Court determined that it needed additional information from the parties. In particular, this Court discovered, subsequent to the three-day bench trial, that the Plaintiffs' contracts at issue provided conflicting explicit deadlines for submitting what the parties referred to as PIMSY notes.[4] The contracts at issue, which explicitly provided for deadlines to submit the notes, had not been referenced by any of the witnesses who testified, nor had they been referred to by Plaintiffs' Counsel. Because important evidence as to this critical issue had been overlooked by the parties at trial, this Court asked the parties to file a memorandum addressing the question of whether the testimony adduced at the bench trial demonstrated that the PIMSY notes were submitted within the time deadline established in Plaintiffs' contracts. (ECF No. 115). This Court also instructed the parties it would be necessary for the Court to determine, as a matter of fact, the sums actually paid to each Plaintiff. The Court instructed both parties to provide all documentation showing the exact payments for services rendered during the time period for which Plaintiffs worked with Access. (ECF No. 115).

Thereafter, on February 28, 2019, Plaintiffs filed supplemental documents, (ECF No. 126), and on March 12, 2019, Defendant Jones filed supplemental documents, (ECF Nos. 134–36). In

---

[3] This Court continued the trial until January 29, 2018 when it became apparent that the parties had not followed the local rules in accordance with meeting and marking exhibits.

[4] "PIMSY" is an electronic medical record system Plaintiffs used to log their clinical services notes. The parties referred to the entries as "PIMSY notes." Defendant required Plaintiffs to log PIMSY notes because that is how she obtained Medicaid reimbursement. In the PIMSY notes entries, Plaintiffs documented services provided to children in terms of "units." One-unit increment is equal to fifteen minutes.

light of the parties' supplemental filings, the Court held a continuation on the bench trial on April 18, 2019 to give the parties a chance to dispute and conduct cross examination on any new information provided to this Court.

Before delving into the factual and legal issues presented in this case, the Court is compelled to make a general observation regarding the quality of the documentation submitted at the bench trial. Neither party[5] adequately provided the Court with the documentation needed to decide the merits of this case.

Defendant did not produce spread sheets, a full record of cancelled checks,[6] payroll, or other documents traditionally associated with calculating employee pay. In fact, Defendant Jones did not produce contemporaneous records of hours worked,[7] nor did she produce accurate records of the pay Plaintiffs actually received.[8] Plaintiffs' counsel submitted tabulations (Plaintiffs' Exhibits #34 & #35), an after-the-fact creation, purporting to outline the hours worked and pay received by Plaintiffs. However, some of the entries were contradicted by testimony and various

---

[5] This Court recognizes that under the FLSA, Defendant, as the employer, has the duty to keep accurate and adequate records. However, it also became obvious Plaintiffs did not take the time to provide a totally accurate recapitulation of their hours worked based on exhibits they had access to.

[6] In the middle of the bench trial, after being asked numerous times by this Court, Defendant Jones returned after a lunch break with images of two checks written to each Plaintiff on May 15, 2015. (Defendant's Exhibit #16). After the three-day bench trial concluded, while this Court was attempting to decide the disputed facts in this case, it again issued an order asking the parties to produce any additional documents evidencing payments actually made to Plaintiffs. Eventually, Jones filed additional check images of payments made to Plaintiffs. (ECF No. 136). The dates on these check images are hard to read. They appear to be check images Defendant recently requested from Bank of America, and they are not sufficient payment records kept during the course of her business.

[7] Defendant submitted some snapshots of PIMSY note entries and emails containing a recap of hours worked by Plaintiffs for various weeks; however, full records were never provided to this Court.

[8] This Court asked both parties numerous times for any records to help show a record of the hours Plaintiffs worked or wages actually paid. Defendant Jones eventually submitted some, but not all, images of checks.

text messages and emails introduced at trial. For the most part, Plaintiffs' case rested upon their oral testimony of their recollections regarding typical days at work since Defendant did not keep records.

In addition, many of the documents introduced during this trial were brought to the courtroom as a result of a request by the Court, and each day of trial presented new documents that would have been better understood by the Court had they been produced at the outset of the case.[9] Further, many exhibits were entered into evidence and never explained or addressed by the parties.[10] With this understanding, the Court now proceeds to do its best to untangle and resolve the issues presented, with the observation that the failure of Defendant to follow even rudimentary bookkeeping principles and document presentation taxes the ability of the legal system to achieve justice years after-the-fact.

After receiving the testimony, carefully considering all of the evidence, weighing the credibility of the witnesses, reviewing the exhibits and briefs, and studying the applicable law, this Court makes the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52. The Court notes that to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

## II.     FINDINGS OF FACT

1.  Access Community Rehabilitative Behavioral Health Services ("Access") is a South Carolina not-for-profit corporation, with a facility located in Lexington, South Carolina. Access

---

[9] At trial, it became clear the parties did not conduct adequate discovery in this case. Nor did they meet seven days before trial to mark and exchange all trial exhibits as required by the local rules of this district.

[10] Moreover, in violation of this Court's local rules, there was a rolling production of exhibits with both parties entering new, unexplained exhibits each day during the four-day bench trial.

provides behavioral modification services to help improve children's ability to get an education and control behavioral impulses. Through an agreement with the public schools, Access provided behavioral modification services to students in various public schools in South Carolina during the academic year.[11] For example, Plaintiff Taylor-White provided services at Academy for Success in Chapin, South Carolina which hosts children who have been expelled in that school district from their schools. There, Access provided a school-based "rehabilitative behavioral health sciences" including social-emotional-behavioral learning, wellness counseling, family support, and transition services. Additionally, during after school hours, regular holiday breaks such as Christmas break and spring break, and during the summertime, Access also provided services to children at its community center located in Lexington, South Carolina.

    2. Access is compensated by the federal government through the Medicaid program for the behavioral services provided to students in South Carolina.

    3. Plaintiff Taylor-White worked for Access from April 20, 2015 to February 20, 2016.[12] Plaintiff Ceasar worked at Access from April 18, 2015 to April 18, 2016.[13]

    4. Both Plaintiffs worked under signed written contracts which expressly provided that they were independent contractors and not employees.[14]

---

[11] The parties could not even agree on the specific services Plaintiffs provided during the school year. Defendant argues that Plaintiffs only provided services to one child at a time in a classroom setting, while Plaintiffs claim they provided services to multiple children at a time in a classroom setting. However, this Court finds that this discrepancy has no bearing on the outcome of this case.

[12] There was conflicting testimony on Plaintiff Taylor-White's start date. Initially, Plaintiff Taylor-White testified she began working on April 20, 2015. Plaintiff Taylor-White testified later she started "around" the 15th or 16th of April. At another point, she testified she started on April 18th and worked for Access through February. This Court finds that Plaintiff Taylor-White began work on April 20, 2015. See Plaintiffs' Exhibits #25 & #35.

[13] At trial, Ceasar testified that he worked for Access from April 2015 to April 2016. Ceasar's contract ran from April 18, 2015 to April 18, 2016. See Defendant's Exhibit #1.

[14] The contract for the first year (April 18, 2015 to April 18, 2016) for Plaintiff Ceasar was introduced at trial, but as to Plaintiff Taylor-White, her contract for 2015 was not introduced as an

5.  At the end of each tax year, Access provided to each Plaintiff an I.R.S. form 1099, signifying that the monies paid to them during the tax year were payments to an independent contractor and not to an employee.[15] Plaintiffs accepted this designation and filed income tax returns claiming the income to be business related and not employee compensation.

6.  Notwithstanding the fact that the employment contracts themselves, as well as the tax records, indicated an independent contractor relationship existed, the actual relationship that existed between the parties was that of employer/employee.

7.  Access and Jones contacted each Plaintiff prior to the commencement of the school term and arranged for their hours of service, told them to wear polos and khaki pants for their uniforms during school year,[16] provided company vans to be used for transportation of the students, and directed Plaintiffs' working hours.[17] Plaintiffs were paid by the hour.

8.  Plaintiffs did not furnish any tools or other materials associated with their employment. Defendant provided equipment such as computers and recreational equipment at Access Community Center.

9.  Plaintiffs essentially worked under two different schedules, one operating during the school year and one operating during the summer recess period. Plaintiffs' summer schedule was driven, in large part, on when the children arrived at school and when the children left school.

---

exhibit at trial. However, all parties stipulated that the contract for Plaintiff Taylor-White was identical to that of Plaintiff Ceasar for the first year. The second contracts for both Plaintiffs (to begin on February 2, 2016 for Plaintiff Ceasar and to begin on January 29, 2016 for Plaintiff Taylor-White) were both introduced as exhibits. See Defendant's Exhibit # 1.
[15] See Plaintiffs' Exhibits #33 & #36.
[16] For example, see Plaintiffs' Exhibit #30.
[17] For example, see Plaintiffs' Exhibit #50.

10.  Defendant arranged Plaintiffs' work schedules usually via email or text message.[18] Plaintiffs were assigned specific children to work with on specific days and times.

11.  Plaintiffs were compensated at the rate of $16.00 per hour.[19]  However, the record is not entirely clear as to when and how Plaintiffs were compensated. In some instances, Plaintiffs were paid by way of check. On other days, they were paid in cash[20] and occasionally through wire transfers or cashier's checks.[21]

12.  Plaintiffs were responsible for logging their time spent providing services to children via a computer program called "PIMSY."[22] The parties referred to the entries made on the PIMSY program as "notes."  In order to receive payment for their services, per the employment agreement, Plaintiffs were required to submit their PIMSY notes within ten days[23] from their rendition of services. In order to be compensated by the Medicaid Program for program provided, it was necessary for the PIMSY notes to be properly entered and transmitted to the Medicaid program.

13. During the course of Plaintiffs' employment, they were frequently late in submitting PIMSY notes, which occasionally caused Access to either suffer a delay or miss payment of the Medicaid proceeds. Testimony in various email and text messages revealed that Defendant frequently reminded Plaintiffs of the time-sensitive deadline.[24]

---

[18] For example, see Defendant's Exhibit #3.

[19] See Defendant's Exhibit #1.

[20]  At trial, Jones testified Plaintiffs were only paid in cash "a few times," and Plaintiffs also testified they were paid in cash several times.

[21] This poorly administered payment system and lack of records made it impossible to determine with precision how much Plaintiffs were actually paid. Although Defendant eventually produced some images of checks, nothing was submitted to document the other forms of payment.

[22] Defendant testified that she was not sure what this acronym stood for.

[23] This Court notes that some of the exhibits contained evidence showing that Defendant required the PIMSY notes to be submitted within five days from the date of service. Plaintiffs' contracts were inconsistent on their face, containing conflicting time requirements.

[24] For example, see Plaintiffs' Exhibit #19.

14. Contrary to the ten day time requirement, for a time, Defendant reluctantly accepted late PIMSY note entries and paid workers the following pay period notwithstanding the fact that the notes were entered late.[25] On multiple occasions, however, Access, through Defendant Jones, provided a warning to Plaintiffs that, from that time forward, PIMSY notes that were entered late would jeopardize Medicaid reimbursement and would therefore cause Plaintiffs to forfeit compensation for the relevant time periods.[26] However, despite these warnings, Defendant Jones followed an inconsistent practice, continuing to pay for late PIMSY notes at times[27] and refusing to pay for late notes at other times.

15. When Plaintiffs began employment at Access, the first paycheck they received was for a two-week work period by way of a check issued about four weeks after they began employment. Plaintiffs received their first paycheck on May 15, 2015,[28] which covered services provided from April 18, 2015 to May 1, 2015.[29] There was thus a two-week "lag" time in receiving compensation for work performed. This two-week lag time continued for the duration of the Plaintiffs' employment at Access. At trial, both Plaintiffs referred to this as the "in the hole" money, meaning that payment for the first two weeks of employment was "in the hole" to be paid to them at the end of their employment. Thus, one question presented is why did Plaintiffs not receive a final

---

[25] For example, see Plaintiffs' Exhibit #19 where Jones agreed on August 23, 2015 via text message to pay Plaintiff Ceasar's late PIMSY notes.

[26] For example, in an email to Plaintiff Ceasar on January 21, 2016, Jones stated: "I am no longer able or willing to allow anyone to go back and fix or e-sign notes after they are 10 days past the date of service. No one will have the opportunity to correct duplicate notes." Defendant's Exhibit #11.

[27] In an email dated March 9, 2016 Jones stated: "In order to process claims in a timely manner, they will have to be submitted/" [sic] released for review prior" to the Friday BEFORE the actual pay day. Claims submitted after will be included in the following pay period if they meet all of the requirements." Plaintiffs' Exhibit #52.

[28] See Defendant's Exhibit #16.

[29] See Defendant's Exhibit #10, which provides the payment schedule.

paycheck two weeks after they ceased working for Access. Defendant claims she did not pay the so-called "in the hole monies" because Plaintiffs failed to timely submit PIMSY notes. However, the evidence submitted and oral testimony revealed that Jones continued to pay late notes as a frequent practice. Defendant even sent an email as late as March 9, 2016 stating that late notes would be paid the following pay period. Consequently, Plaintiffs are entitled to the so called "in the hole" paychecks.

16. Plaintiffs both claim they are entitled to a summer bonus of $680.00. However, Plaintiffs were required to be present every day at work during the "summer session" from June 8, 2015 to August 14, 2015 to be eligible for a summer bonus equivalent to forty hours of regular pay.[30] Plaintiffs both admitted they were not present every day at work during the summertime period.[31] Therefore, no summer bonus will be awarded.

17. Plaintiffs also claim they are entitled to an unpaid Christmas bonus. Defendant contends there was never a Christmas check or bonus promised. Plaintiffs testified they were told they would receive $1,400.00 for a Christmas bonus. Plaintiff Ceasar testified that he could not remember the exact details or requirements of the Christmas bonus. At trial, the Court asked Plaintiff Ceasar and Counsel for Plaintiff if there was anything in writing regarding the Christmas bonus or if it was just an oral statement by Defendant Jones. Plaintiff Ceasar testified that it was just an oral statement but that there might be an email he sent Counsel for Plaintiff that was not

---

[30] See Defendant's Exhibit #12.
[31] At trial, both Plaintiffs admitted they were absent at least one day during the summer session. Plaintiffs argue another supervisor told them if they missed one day during the summer session their summer bonus would merely be reduced and not forfeited entirely; however, the Court finds there is no evidence to support this assertion.

presented to this Court.[32] This Court finds there was never a Christmas bonus available to Plaintiffs.

18.  As to the claims for overtime pay, as indicated previously, the Court is called upon to reconstruct work schedules and wages paid without adequate contemporaneous records and based on fading memories. *See Martin v. Deiriggi*, 985 F.2d 129, 132 (4th Cir. 1992) ("The inability of the court to provide more detailed findings resulted from the unavailability of accurate and complete employee wage and hour records.").

As an initial matter, Defendant conceded that Plaintiffs did work some overtime hours, for which they were not compensated.[33] While on the stand, Defendant, with commendable candor, admitted that late in the employment relationship, Plaintiff Ceasar worked a total of 200 hours overtime, and Plaintiff Taylor-White worked a total of 30 hours overtime. Defendant testified these overtime hours were worked during the summertime of 2015 when Plaintiffs transported children. Defendant admitted that Plaintiff Ceasar provided transportation services consistently throughout the summer and also two months into the school year. However, Defendant argued that Plaintiff Taylor-White only provided transportation services "at most a month during the one summer."

Defendant conceded there were some days Plaintiffs worked ten- and one-half hour days because they worked six to eight hours with clients and then also provided one or two hours of transportation for the students. In fact, Defendant even testified that she would not have let Plaintiffs work that much if they were not (as she believed) independent contractors. In such a case

---

[32] Plaintiff Ceasar also testified that the believed the "Christmas bonus" eligibility required the workers to be present at work everyday during the specified time period. Ceasar then testified that he thought he may have missed one day. In any event, to the extent there was in fact a Christmas bonus offered, this Court finds Plaintiff Ceasar was not eligible to receive it since he admitted he missed a day.

[33] Defendant testified she paid Plaintiffs their regular hourly rate of $16.00 an hour for all hours worked because she believed they were independent contractors and not employees.

where Defendant has conceded Plaintiffs did work some overtime hours for which they were not paid, and no records exist, this Court has to develop a method of calculating the unpaid overtime due to Plaintiffs.

"The regulations implementing the FLSA mandate that the employer keep records of the '[h]ours worked each workday' by all employees. 29 C.F.R. § 516.2(a)(7) (2000)." *Lee v. Vance Exec. Prot., Inc.*, 7 F. App'x 160, 165 (4th Cir. 2001) (unpublished). In a case where the employer has failed to keep adequate records, the United States Supreme Court has stated: "The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). The Supreme Court has articulated a burden shifting framework to apply when an employer fails to keep proper records.

Contrary to FLSA requirements, Defendant did not keep adequate records.[34] Although Defendant argues the PIMSY notes are an accurate reflection of the Medicaid-compensable hours worked by Plaintiffs,[35] this Court agrees with Plaintiffs that the PIMSY notes clearly do not evidence all of the hours worked. The PIMSY notes were merely a requirement for Defendant to receive federal funding reimbursement from Medicaid. Plaintiffs logged their transportation hours separately outside of the PIMSY system because Medicaid would not reimburse for transportation

---

[34] The Court recognizes that Defendant could argue that she did not keep the required records because she in good faith believed Plaintiffs were working as independent contractors. This argument, however, was never advanced by Defendant. Moreover, the relationship that existed was clearly that of employer/employee, notwithstanding Defendant's transparent attempt to characterize them as independent contractors in the employment contracts.

[35] While Defendant did provide various entries of Plaintiffs' PIMSY notes, this Court was never provided with the full records of the PIMSY notes for the time Plaintiffs worked for Access. Even if this Court were inclined to agree with Defendant that PIMSY notes were complete records of hours worked, which it does not, they were never provided in full to this Court.

hours.[36] Testimony revealed that for a time Plaintiffs logged their transportation time on log sheets; however, sometime thereafter, Plaintiffs emailed Defendant and their supervisor their transportation hours.[37] Plaintiffs used various methods to report their time to Defendant including time sheets, emails, and text messages.

Defendant's records of wages actually paid are inadequate. After asking Defendant multiple times for any records of wages actually paid, and after the three-day bench trial ended, Defendant Jones eventually provided this Court with copies of check images from Access's Bank of America account.[38] (ECF No 136-2). Defendant testified that Plaintiffs could go to their own banks and print out check images after the fact just as Defendant did.[39] However, Plaintiffs are not responsible to keep their own records—the burden is on the employer to do so.[40] This Court was provided with far from perfect records to reconstruct the amount of wages actually paid. As an initial matter, this Court has no way of knowing that the check images provided by Defendant are a complete record of all the checks paid to Plaintiffs. Regardless, as noted previously, checks were not the only form of payment Plaintiffs received. Testimony revealed that Plaintiffs were often

---

[36] See Plaintiffs' Exhibit #23 p. 2.

[37] For example, Defendant's Exhibit # 9 contains copies of some of Plaintiff Ceasar's time log sheets for transportation. The Exhibit also contains emails from Plaintiff Taylor-White to Defendant Jones with a summary of her hours worked, including her transportation hours for the month of June 2015.

[38] Plaintiffs objected to the production of the check images because they were not produced during discovery. The Court took the objection under advisement. The Court now overrules the objection, with the observation that the exhibit is not entirely helpful to Defendant.

[39] Although the burden is on Defendant, in an attempt to achieve a fair and just result, this Court still asked Plaintiffs multiple times if they had any records of payments actually received. Taylor-White has no records whatsoever of payments received because she would take personal checks or cashier's checks from Jones to Jones' bank and have them cashed. (ECF No. 126 p. 4). Plaintiff Ceasar also has no records of payments received.

[40] Interestingly, at trial, Jones testified that Plaintiff Taylor-White's claim for 310 hours of unpaid overtime was "completely inaccurate" and that Defendant had Taylor-White's time sheets. However, once again, Defendant failed to produce these records to the Court.

paid by check; however, at times Defendant would transfer money to Plaintiffs' accounts. Further, all parties testified that Defendant paid Plaintiffs in cash at least several times.

This is a case where the Court's decision in made more difficult because the employer has failed to keep adequate records of the wages actually paid and the hours actually worked. However, keeping in line with Supreme Court precedent, this Court does not believe the solution is to deny Plaintiffs recovery on the ground that they are unable to prove the precise extent of uncompensated work.

When an employer has failed to keep adequate and accurate records of wages and hours, "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Mt. Clemens*, 328 U.S. at 687–88. Once an employee has produced sufficient evidence, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id.* However, "[i]f the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Id.*

Plaintiffs presented the Court with two charts purporting to be a recapitulation of hours worked and wages paid. (Plaintiffs' Exhibits #34 for Plaintiff Ceasar and #35 for Plaintiff Taylor-White). Plaintiffs testified they based the charts off various records they reviewed, such as emails and PIMSY note entries and their memories of their set working schedules. These charts are after-the-fact reconstructions based upon mathematical computations that assume Plaintiffs worked a certain number of hours per day.

Applying the burden shifting framework from *Mt. Clemens*, through their charts, Plaintiffs carried their initial burden by showing they in fact performed work for which they were improperly compensated and they produced sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. Other courts have found that a plaintiff's sworn testimony of an estimation of hours worked is enough to carry their initial burden under *Mt. Clemens*. *See Alston v. DIRECTV, Inc.*, 254 F. Supp. 3d 765, 788 (D.S.C. 2017) ("With respect to the sufficiency of Plaintiffs' testimony, the court begins by noting that, generally, in this court, an FLSA plaintiff's estimations offered in sworn statements as to the amount of improperly compensated work is, alone, sufficient to meet his initial burden under the *Mt. Clemens* framework, even if the estimation is imprecise.")

Under the burden shifting framework, Defendant failed to come forward with evidence of the precise number of hours worked or wages paid. However, after examining various exhibits submitted by Defendant, it became apparent that some of the entries on Plaintiffs' charts were not accurate. Thus, Defendant did come forward with some evidence countering Plaintiffs' evidence; however, Defendant did not produce enough evidence to cause the Court to disregard Plaintiffs' charts entirely. *See Geer v. McGregor*, No. 8:10-CV-2219-HMH-JDA, 2013 WL 842528, at *6 (D.S.C. Jan. 10, 2013), *report and recommendation adopted*, No. CA 8:10-2219-HMH-JDA, 2013 WL 808838 (D.S.C. Mar. 5, 2013) ("Plaintiff has put forth evidence showing he worked [for his employer], and he should not be penalized because he is unable to prove the precise extent of uncompensated work.").

Plaintiffs' charts claim that they were paid forty hours a week at their hourly rate of $16.00 per hour. Thus, Plaintiffs claim they received $1,280.00 every two weeks. This Court recognizes the charts depictions of the wages actually paid are in a few instances belied by some of the checks

furnished by Defendant showing compensation actually paid. For example, on May 15, 2015, Access paid Plaintiff Taylor-White $1,376.00 and Plaintiff Ceasar $1,352.00. (Defendant's Exhibit #16). These two check images conflict with the charts, which claim Plaintiffs were only paid $1,280.00 for two weeks of work. However, other check images show that on most occasions, Plaintiffs were actually paid *less* than what the charts claim they were paid. Thus, while the charts may not be 100% accurate, they err on the side of a conservative approximation of wages paid, so they are still a fair and reasonable inference of wages actually paid to Plaintiffs. This is especially true since checks were not the only form of payment provided to Plaintiffs.

This Court also recognizes that the charts' recapitulations of hours actually worked are also not accurate. Text messages and emails for various days show that Plaintiffs were not at work for traditional reasons such as health issues, automobile problems, and even a home burglary. The charts did not account for some of the days when Plaintiffs were clearly not at work.[41] This Court notes the following examples: An email from December 13, 2015 reveals that Plaintiff Ceasar arrived to work late on December 14, 2015. (Defendant's Exhibit #4). However, the chart claims that Plaintiff Ceasar arrived to work at 8:00 AM. An email from February 10, 2016, reveals that Plaintiff Taylor-White was out of work on February 10, 2016. (Defendant's Exhibit #4). However, the chart claims that Taylor-White was at work from 8:00 AM to 6:30 PM on February 10, 2016.

Another email dated December 1, 2015 shows Plaintiff Taylor-White was absent and Plaintiff Ceasar left at 2:30 PM. However, the charts claim Plaintiff Ceasar worked until 6:00 PM and Plaintiff Taylor-White worked from 8:00 AM until 4:30 PM on December 1, 2015. An email from November 20, 2015 again shows Plaintiff Taylor-White was absent from work. However,

---

[41] This Court itself sifted through the various exhibits and identified these discrepancies in Plaintiffs' Exhibits #34 & #35.

the chart claims that Plaintiff Taylor-White worked ten- and one-half hours on November 20, 2015.[42] An email from August 24, 2018 also shows Plaintiff Taylor-White was out sick; however, the chart again claims Plaintiff Taylor-White worked from 8:00 AM to 5:30 PM. Additionally, September 7, 2015 was an unpaid holiday (Plaintiffs' Exhibit #19 p. 4); however, the charts claim that both Plaintiffs worked full days on September 7, 2015. Further, the chart claims Plaintiff Ceasar worked from 8:00 AM to 6:30 PM on September 17, 2015; however, text messages reveal Plaintiff Ceasar was in fact absent on that day. (Plaintiffs' Exhibit #19 p. 4). The chart also shows Plaintiff Ceasar worked from 9:00 AM to 6:30 PM on July 16, 2015 and on July 17, 2015; however, Plaintiff Ceasar's time sheets reveal he was absent on both July 16, 2015 and July 17, 2015. (Defendant's Exhibit #9).

This Court also recognizes that Defendant's Exhibit #9, which contains a few of Plaintiff Ceasar's transportation time logs conflicts with his chart. For example, from July 13, 2015 to July 24, 2015 the log shows that Plaintiff Ceasar ended transportation services at 6:00 PM, while the chart claims he provided transportation services until 6:30 PM. However, this Court also notes that the transportation time logs show that Plaintiff Ceasar provided transportation services from July 13, 2015 to July 24, 2015 from 7:30 AM to 8:30 AM Monday through Friday. However, the chart does not give Plaintiff Ceasar credit for all of this transportation time because it claims Plaintiff Ceasar started work at 9:30 AM—a full hour and one half later than when he actually began working. Thus, although there are several discrepancies in the chart, the chart still contains conservative approximations that help make up for the discrepancies. And again, Defendant did not provide this Court with any other full accurate records to show the hours Plaintiffs worked.

---

[42] It is notable that the email on November 16, 2015 states that Plaintiff Taylor-White "remains out today." However, the chart claims Plaintiff Taylor-White worked full days the entire week of November 16, 2015.

*See Guerra v. Teixeira*, No. CV TDC-16-0618, 2019 WL 330871, at *12 (D. Md. Jan. 25, 2019) (quoting *Pforr v. Food Lion, Inc.*, 851 F.2d 106, 108 (4th Cir. 1988)) ("Because courts may award approximate damages to employees, employees do not have to 'prove each hour of overtime work with unerring accuracy or certainty.'").

Based on the evidence submitted by Defendant, the Court does not find that Plaintiffs' charts are 100% accurate because they do not account for all of the days Plaintiffs were clearly absent or left early from work. On the other hand, the charts do account for some absences. For example, the charts consider the Plaintiffs' week of absence during the flood in Columbia, South Carolina in October 2015. Moreover, the charts err on the side of caution because Plaintiffs testified they had to arrive at school at 7:30 AM each morning; however, the charts only give them credit for arriving to school at 8:00 AM. Based on some discrepancies this Court discovered in Plaintiffs' Exhibits #34 and #35, it is not inclined to give full credit to the overtime hours claimed by Plaintiffs in the charts. However, this Court recognizes that case law authorizes courts to award approximate damages to employees in a case where the employer failed to keep adequate records.

"The standard under *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), does not mandate that a plaintiff prove each hour of overtime work with unerring accuracy or certainty." *Pforr v. Food Lion, Inc.*, 851 F.2d 106, 108 (4th Cir. 1988). Further, "[a] FLSA case is not to be dismissed nor should recovery be denied because proof of the number of hours worked is inexact or not perfectly accurate." *Davis v. Louis Broadwell, LLC*, No. CV 2:10-2947-RMG, 2011 WL 13150438, at *6 (D.S.C. Oct. 12, 2011) (quoting *Leonard v. Carmichael Properties & Management Co., Inc.*, 614 F. Supp. 1182, 1186 (D.C. Fla. 1985)).

Based on the testimony heard at trial (or lack thereof) and the exhibits submitted, this Court finds that 80% of the overtime hours claimed by Plaintiffs is a fair and reasonable approximation.[43] In their charts, Plaintiff Ceasar claims 504.50 hours of overtime and Plaintiff Taylor-White claims 310 hours of overtime.

The Court finds each Plaintiff is entitled to 80% of the overtime hours claimed, so Plaintiff Ceasar is entitled to 403.60 hours of unpaid overtime and Plaintiff Taylor-White is entitled to 248.00 hours of unpaid overtime. Plaintiffs are entitled to $24.00 for each hour of overtime, which is one and a half times their regular hourly rate of $16.00 per hour. Thus, Plaintiff Ceasar is entitled to $9,686.40 and Plaintiff Taylor-White is entitled to $5,952.00 for unpaid overtime.

## III.    CONCLUSIONS OF LAW

1. As noted previously, both Plaintiffs operated under written contracts providing that they were independent contractors. Additionally, the monies paid to them were treated as payments to independent contractors for tax purposes. The contractual provisions and the tax treatments are, however, not controlling. The Court is required to look to the economic realities announced by the Fourth Circuit in *McFeeley v. Jackson* 835 F.3d 235 (4th Cir. 2016). According to *McFeeley*, "[t]he touchstone of the 'economic realities' test is whether the worker is 'economically dependent on the business to which he renders service or is, as a matter of economic [reality], in business for himself.'" The economic realities test is comprised of six factors:

> (1) [T]he degree of control that the putative employer has over the manner in which the work is performed; (2) the worker's opportunities for profit or loss dependent on his managerial skill; (3) the worker's investment in equipment or material, or his employment of other workers; (4) the degree of skill required for the work; (5) the permanence of the working relationship; and (6) the degree to which the services rendered are an integral part of the putative employer's business.

---

[43] While it may at first appear that the Court has oversimplified the damages issue by taking a percentage of Plaintiffs' submissions, the Court has no other viable alternative, given the poor recordkeeping and less-than-helpful evidentiary presentation in this case.

*McFeeley*, 835 F.3d at 241 (quoting *Schultz v. Capital Int'l Sec.*, *Inc.*, 466 F.3d 298 (4th Cir. 2006)).

No one single factor is dispositive and the Court "must adapt its analysis to the particular working relationship, the particular workplace, and the particular industry in each FLSA case." *Id*.

2.  Application of the *McFeeley* test to the facts presented in this litigation led this Court to conclude that the relationship between Plaintiffs and Access was that of employer/employee. First of all, Access exercised a significant degree of control over the manner in which the work was performed. As noted, Access provided assignments to certain students and certain facilities at certain places and times. Access provided uniforms and vans for transportation purposes. Next, Plaintiffs' opportunities for profit or loss were not dependent upon their managerial skill. Rather, they were paid strictly on an hourly basis. The working relationship lasted about a year for Plaintiff Ceasar and about ten months for Plaintiff Taylor-White. Further, the behavioral modification services Plaintiffs rendered were an integral part of Defendant's business. Application of these six factors to the facts of this case, leads to the conclusion that Plaintiffs were employees. Accordingly, under the FLSA, they were entitled to compensation at a rate of one and one-half times their normal hourly compensation of $16.00 per hour for all hours of work performed in excess of 40 hours per week. 29 U.S.C. § 207.

3. Plaintiffs are not eligible for their summer bonus because they missed days of work during the summer session.

4. Plaintiffs are not entitled to a Christmas bonus because there was never a Christmas bonus available to Plaintiffs.

5. Plaintiffs are entitled to their last paycheck (the so-called "in the hole" money) under the South Carolina Payment of Wages Act.[44] Under the South Carolina Code Ann. § 41-10-40: "An employer **shall not withhold** or divert any portion of an employee's wages unless the employer is required or permitted to do so by state or federal law or the employer has given written notification to the employee of the amount and terms of the deductions as required by subsection (A) of § 41-10-30." (emphasis added). Plaintiffs are entitled to their last paycheck for two weeks of work even though their PIMSY notes were submitted late because Defendant Jones had a practice of regularly paying late notes. At trial, Jones admitted she paid late notes in the past even though she should not have. However, Defendant's March 9, 2016 email stated that late notes would be paid the following pay period.

In fact, contrary to the written notification requirement under the Wage Payment Act, Defendant notified Plaintiffs that their late notes *would* be paid, and not withheld, the following pay period. Thus, Plaintiffs late notes submitted shortly after this March 9, 2016 email are eligible for payment. Plaintiffs are entitled to a paycheck for their last two weeks of services provided based on their computation of hours provided in Plaintiffs' Exhibits #34 and #35. For services provided from April 4, 2016 to April 15, 4016, Plaintiff Ceasar is entitled to $1,280.00.[45] For

---

[44] "The South Carolina Wage Payment statute is broader than the FLSA in that it is not limited to controversies involving minimum wage and overtime but applies to all wages due, and the plaintiff's claim is based on lack of written notice of deductions." *Spallone v. SOHO Univ., Inc.*, No. 4:15-CV-1622-RBH, 2015 WL 5098154, at *5 (D.S.C. Aug. 31, 2015). *See also McMurray v. LRJ Restaurants, Inc.*, No. 4:10-CV-01435-JMC, 2011 WL 247906, at *2 (D.S.C. Jan. 26, 2011) ("Plaintiff is also seeking redress for Defendants' alleged failure to honor agreements to pay wages which may be in excess of minimum wage and failure to pay wages when due. These claims are separate and distinct from Plaintiff's FLSA claims. Accordingly, they are not preempted by the FLSA.").

[45] According to their charts, Plaintiffs both worked 40 hours of "regular hours" during their last two weeks of employment. (Plaintiffs' Exhibits #34 & #35). Plaintiffs also claim overtime hours worked during these last two weeks. However, this claimed overtime is part of Plaintiffs' FLSA award for unpaid overtime compensation and is not appropriate under the SC Wage Payment Act.

services provided from February 8, 2016 to February 19, 2016, Plaintiff Taylor-White is entitled to $1,280.00.[46] *See Dumas v. InfoSafe Corp.*, 320 S.C. 188, 195, 463 S.E.2d 641, 645 (Ct. App. 1995) (explaining that an officer or agent of a company may be held personally liable under the South Carolina Payment of Wages Act if they knowingly permit the company to violate the Act).

5. Plaintiffs are entitled to prejudgment interest on their unpaid wages under the SC Wage Payment Act. Plaintiffs are awarded prejudgment interest, pursuant to South Carolina Code Ann. § 34–31–20(A), at a rate of eight and three-fourths percent per annum from the date two weeks after the last day of employment[47] to the date of this Order. *See Atkinson v. House of Raeford Farms, Inc.*, No. 6:09-CV-01901-JMC, 2012 WL 2871747, at *3 (D.S.C. July 12, 2012). Plaintiff Bernard Ceasar is awarded $1,280.00 plus prejudgment interest accumulated from May 2, 2016 to the date of this Order. Plaintiff Taylor-White is awarded $1,280.00 plus prejudgment interest accumulated from March 5, 2016 to the date of this Order.

---

*See McMurray v. LRJ Restaurants, Inc.*, No. 4:10-CV-01435-JMC, 2011 WL 247906, at *2 (D.S.C. Jan. 26, 2011) ("To the extent that Plaintiff seeks compensation under the Wage Act for overtime pay otherwise required by the FLSA or alleges that he received less than the federal minimum wage as a result of Defendants' failure to pay him for all hours worked, *Anderson* clearly provides that these claims are preempted by the FLSA and must be dismissed.").

[46] At trial, Plaintiffs did not argue for treble damages under the SC Wage Payment Act. In any event, Plaintiffs are not entitled to treble damages because a good faith wage dispute existed since Plaintiffs submitted untimely PIMSY notes in violation of their contracts and other emails and text messages Defendant sent Plaintiffs reminding them of this time sensitive deadline. *See Goodwyn v. Shadowstone Media, Inc.*, 408 S.C. 93, 98, 757 S.E.2d 560, 563 (Ct. App. 2014) (quoting *Rice v. Multimedia, Inc.*, 318 S.C. 95, 98–99, 456 S.E.2d 381, 383 (1995)) ("An award of treble damages and attorney's fees is appropriate only when 'there [i]s no good faith wage dispute' because 'an employer should not be penalized . . . for failure to pay wages upon assertion of a valid defense to payment.'").

[47] Plaintiffs were paid on a bi-weekly pay schedule.

6. Thus, Plaintiff Ceasar is entitled to $1,618.45[48] for unpaid wages and Plaintiff Taylor-White is entitled to $1,636.25[49] for unpaid wages.

7.  As previously noted, apart from the 230 hours of overtime conceded by Defendant, the testimony regarding whether the Plaintiffs actually worked more than 40 hours per week was conflicting. Defendant did not present credible documentary evidence to support its case, and the testimony of both Plaintiffs and Defendant was often times equivocal, halting, contradicted, and not always credible. The Court is thus faced with a bewildering situation where determining when Plaintiffs worked overtime for many of their days in service is difficult, if not impossible. On this state of the record, the Court has no choice but to conclude that Plaintiffs should not be penalized merely because Defendant failed to keep inadequate records.  *See Mt. Clemens*, 328 U.S. at 687.

8. Plaintiff Ceasar claims 504.50 hours of overtime and Plaintiff-White claims 310.00 hours of overtime. This Court finds each Plaintiff is entitled to 80% of the overtime hours claimed, so Plaintiff Ceasar is entitled to 403.60 hours of unpaid overtime and Plaintiff Taylor-White is entitled to 248.00 hours of unpaid overtime. Plaintiffs are owed $24.00, one and a half times their hourly rate of $16.00 per hour, for each hour of overtime worked. Application of these hours for overtime compensation yields the following award to each Plaintiff: Bernard Ceasar 403.60 hours x $24.00 per hour=$9,686.40; Tawanda Taylor-White 248.00 hours x $24.00 per hour=$5,952.00.

---

[48] Plaintiff Ceasar is entitled to prejudgment interest on the $1,280.00 accruing from May 2, 2016, which is two weeks after Plaintiff Ceasar's last day of employment, to the date of this Order. It has been 1,103 days since May 2, 2016. $1,280.00 x 8.75%=$112.00 in prejudgment interest per year. 112/ 365 days=.30684932 per day. Multiplying the per day rate times 1,103 days=$338.454795 in prejudgment interest. $1,2800.00 + $338.454795 =$1,618.45479

[49] Plaintiff Taylor-White is entitled to prejudgment interest on the $1,280.00 accruing from March 5, 2016, which is two weeks after Plaintiff Taylor-White's last day of employment, to the date of this Order. It has been 1,161 days since March 5, 2016. $1,280.00 x 8.75%=$112.00 in prejudgment interest per year. 112/365=.30684932 per day. Multiplying that per day rate times 1,161 days=$356.252055 in prejudgment interest. $1,280.00 + $355.945205=$1,636.25205.

9. In total, Plaintiff Ceasar is awarded $9,686.40 for unpaid overtime compensation and Plaintiff Taylor-White is awarded $5,952.00 for unpaid overtime compensation.

10. To this figure, the Court will add liquidated damages in the sum of $15,638.40.[50] "The FLSA provides for mandatory liquidated damages in an amount equal to the unpaid overtime compensation. 29 U.S.C. § 216(b)." *Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 375 (4th Cir. 2011). "Under the Portal Act, however, a district court, in its sound discretion, may refuse to award liquidated damages if 'the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA].' 29 U.S.C. § 260. The employer bears the burden of proof in establishing this defense." *Id.* (quoting *Donovan v. Bel–Loc Diner, Inc.*, 780 F.2d 1113, 1118 (4th Cir. 1985)). The undisputed evidence discloses that Defendant Jones did not seek the advice of an attorney or take any other proactive steps when classifying her workers as independent contractors. Thus, Plaintiffs are entitled to liquidated damages for their unpaid overtime wages.

11. This Court finds Defendant is not liable for breach of contract. Defendant did not breach its independent contractor contract with Plaintiff because the contract did not require Defendant to provide Plaintiffs with a certain amount of work.

12. Plaintiffs are not entitled to pre-judgment interest on their unpaid overtime compensation under the FLSA since Plaintiffs have been awarded liquidated damages. "[T]he United States Supreme Court held that FLSA's liquidated damages were provided in lieu of calculating the costs of delay—which is the function of prejudgment interest—and therefore that

---

[50] This sum is the result of adding Plaintiff Ceasar's award of $9,686.40 for unpaid overtime compensation and Plaintiff Taylor-White's award of $5,952.00 for unpaid overtime compensation.

a claimant could not recover both prejudgment interest and liquidated damages." *Hamilton v. 1st Source Bank*, 895 F.2d 159, 166 (4th Cir. 1990) (quoting *Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697, 715–16 (1945)).

13.   Plaintiffs are entitled to post-judgment interest on their award of unpaid wages and unpaid overtime compensation at the interest rate provided by 28 U.S.C. § 1961. *See Kennedy v. A Touch of Patience Shared Hous., Inc.*, 779 F. Supp. 2d 516, 527 (E.D. Va. 2011) (Although a claimant cannot recover both FLSA liquidated damages and pre-judgment interest, "[t]here does not, however, appear to be any analogous prohibition in FLSA jurisprudence against awards of post-judgment interest").

14. As successful parties, Plaintiffs are entitled to recover reasonable attorneys' fees under 29 U.S.C § 216(b). "The amount of the attorney's fees, however, is within the sound discretion of the trial court." *Burnley v. Short*, 730 F.2d 136, 141 (4th Cir. 1984). Prior to the bench trial, the Court advised Counsel for Plaintiffs to produce affidavits from other attorneys practicing in the employment law field to document the traditional hourly rates for such work in the Columbia, South Carolina area. Initially, Plaintiffs' counsel failed to produce the affidavits requested but instead produced internet searches demonstrating outrageous attorney fee requests that have been rejected by courts across the country.[51]

15. On February 24, 2019, this Court again ordered affidavits from Plaintiffs' Counsel from practitioners in the Columbia, South Carolina area who specialize in employment law, which set out the reasonable and customary hourly rates for such practitioners. (ECF No. 113). Thereafter, on February 28, 2019, Counsel for Plaintiffs provided adequate affidavits. (ECF No. 125).

---

[51] For example, see Plaintiffs' Exhibit #17.

16. The Court is prepared to award Plaintiffs' Counsel reasonable compensation at the rate of $300.00 per hour. This is the amount sought by Plaintiffs' Counsel in her application for fees, is supported by the affidavits of other attorneys, and is in line with what this Court has awarded in employment discrimination litigation in recent cases. Plaintiffs' Counsel seeks $33,527.50 in attorneys' fees and $749.17 in costs:[52]

- $22,350.00[53] for services rendered by Counsel for Plaintiffs (74.50 hours at an hourly rate of $300.00 per hour);

- $4,665.00 for services rendered by staff of Cromer Babb Porter & Hicks (31.10 staff hours at an hourly rate of $150.00 per hour);

- $187.50 for services rendered by J. Lewis Cromer of Cromer Babb Porter & Hicks, LLC;

- $3,000.00 in retainer fees paid to Cromer Babb Porter & Hicks, LLC;

- $1,500.00 in consultation fees paid to Cromer Babb Porter & Hicks, LLC;

- $1,825.00 for services rendered by Gaffney Lewis & Edwards, LLC;

- and $749.17 in costs.

This Court will use the Lodestar Method to calculate attorneys' fees.[54] "While it is well within the discretion of the district court to determine the amount of an award of attorney's fees, *Burnley v. Short,* 730 F.2d 136, 141 (4th Cir.1984), and to adjust the lodestar upward or downward

---

[52] See Plaintiffs' Exhibits #10 & #11.

[53] Plaintiffs' Exhibit #10 requests $19,520.00 for services rendered by Cromer Babb Porter & Hicks, LLC as of October 15, 2018. However, based on the supporting exhibits provided, it appears that Counsel for Plaintiffs made a calculation error. As of October 15, 2018, the affidavit claims $17,040.00 for services rendered by Plaintiffs' Counsel (56.8 hours x $300.00 per hour=$17,040.00) and $2,490.00 for services rendered by staff (16.6 hours x $150.00 per hour=$2,490.00). Adding these two figures together, it appears Plaintiffs' Counsel actually seeks $19,530.00. The Court calculated the total figure of $22,350.00 based on the hours claimed in Counsel for Plaintiffs' affidavit in Plaintiffs' Exhibit #11.

[54] In total, Plaintiffs' Counsel claims she worked 74.50 hours on this case and firm staff worked 31.10 hours on this case.

as it deems appropriate, this must be done on a principled basis, clearly explained by the court." *Lyle*, 954 F.2d at 989.

As an initial matter, this Court has multiplied the number of hours reasonably expended by the customary hourly rate to establish a preliminary amount for the award of fees.[55] This Court finds that 24.8[56] hours for Plaintiffs' Counsel are a reasonable number of hours expended on this case at an hourly rate of $300.00. This Court also finds 10.4 hours for staff are a reasonable number of hours expended on this case at an hourly rate of $150.00.[57]

Additionally, this Court finds 2.10 hours of services rendered by Gaffney Lewis & Edwards, LLC are a reasonable number of hours expended on this case at an hourly rate of $250.00.[58] Plaintiffs' Exhibit #3, which provides the bill from Gaffney Lewis & Edwards, LLC claims "$1,825.00 as previous balance before adjustments." However, the bill itself only provides detailed billing entries for 2.10 hours of services rendered, and this Court will not provide attorneys' fees based on a bare number of hours worked without billing entries.

---

[55] This Court considered the following factors: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases." *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978).

[56] Plaintiffs' Counsel claims 74.50 hours of services rendered on this case. This Court finds that 1/3 of these hours are in fact reasonable. The explanation for this finding is explained below.

[57] Plaintiffs' Counsel claims 31.10 hours of services rendered by staff on this case. This Court finds that 1/3 of these hours are in fact reasonable. The explanation for this finding is explained below.

[58] This Court notes Gaffney Lewis & Edwards, LLC's hourly rate of $250.00 (which is $50.00 less per hour than Counsel for Plaintiffs' hourly rate) is a reasonable hourly rate.

Thus, this Court finds the lodestar fee in this case is $9,525.00.[59] "Though the lodestar—the product of the hours reasonably expended times a reasonable rate—is a presumptively reasonable fee, the calculation of the lodestar 'does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward.'" *Lyle v. Food Lion, Inc.*, 954 F.2d 984, 988–89 (4th Cir. 1992) (internal citations omitted). "These other considerations . . . may include the ones identified in *Johnson v. Georgia Highway Express, Inc.* . . ., though 'many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate'" *Id.* (quoting *Hensley*, 461 U.S. at 434 n.9).

This Court further finds that a downward adjustment of ten percent from $9,525.00 is appropriate in this case.[60] *See Burnley v. Short*, 730 F.2d 136, 141 (4th Cir. 1984) ("The trial judge then considered the other factors outlined in *Barber* and adjusted the fee downward."). Thus, this Court finds that an appropriate award for attorneys' fees is $8,572.50.

This Court finds that the initial lodestar fee and the subsequent downward adjustment is appropriate in this case based on the following:[61] (1) This was a straightforward case with no novel

---

[59] This figure contains the following hours: (1) 10.4 staff hours x $150.00=$1,560.00 for staff hours; (2) 24.80 hours for services rendered by Plaintiffs' Counsel x $300.00=$7,440.00; and (3) 2.10 hours for services rendered by Gaffney Lewis & Edwards, LLC x $250.00=$525.00. This Court will not award the $187.50 requested for services rendered by J. Lewis Cromer, Counsel's law partner, for the thirty minutes it took to prepare the affidavit stating that Counsel for Plaintiffs' hourly rate is reasonable. Additionally, this Court will not award the $1,500.00 for consultation fees and the $3,000.00 in retainer fees because as explained below, the Court finds that these additional fees are not reasonable in addition to the lodestar fee this Court reached. *See Jackson v. Estelle's Place, LLC*, 391 F. App'x 239, 244 (4th Cir. 2010) ("*See Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S. Ct. 1933, 76 L.Ed.2d 40 (1983)) (noting that a district court may either identify particular hours to be eliminated or reduce the fee in light of the limited success in calculating fee award).").

[60] *See Burnley v. Short*, 730 F.2d 136, 141 (4th Cir. 1984) ("The trial judge then considered the other factors outlined in *Barber* and adjusted the fee downward.").

[61] Although the *pro se* Defendant did not specifically challenge the amount of attorneys' fees sought by Plaintiffs' Counsel, this Court exercised its discretion in conducting an independent review of the fees requested.

or complex legal issues; (2) Defendant was not represented by counsel; (3) Plaintiffs did not prevail

on their breach of contract claims, all of their unpaid wages claims,[62] claims for a summer bonus,

or claims for a Christmas bonus; (4) Before considering the essentially automatic award of

liquidated damages, Plaintiffs are awarded a total of $18,893.10 for unpaid overtime compensation

and unpaid wages. Including liquidated damages, Plaintiffs, *together*, are awarded a total of

$34,531.50. This award is relatively low in light of the fact that Plaintiffs claimed damages in

excess of $113,000.00 at trial. *See Farrar v. Hobby*, 506 U.S. 103, 114, 113 S. Ct. 566, 574, 121

L. Ed. 2d 494 (1992) (quoting *Hensley*, 461 U.S. at 436) ("Indeed, 'the most critical factor' in

determining the reasonableness of a fee award 'is the degree of success obtained.'"); and (5) An

additional reason for the Court's substantial reduction in the fees requested by Plaintiffs' Counsel

is the fact that Counsel failed to provide the Court with citations to readily-available case authority

for many of the legal issues presented in this case. For example, Counsel gave the Court no

authority to impose liability on Jones individually under the FLSA. Even more importantly, the

Court had to, sua sponte, develop the law applicable to FLSA cases where inadequate records are

kept, and the burden-shifting regime that flows from the failure to keep adequate records. These,

and other important legal principles favorable to Plaintiffs' case, were never presented to the Court.

Additionally, the continuous roll out of documents and other evidence as the trial progressed made

this case more difficult than it needed to be.

In sum, the Court has determined that a reasonable number of hours expended on this case

is 37.3 hours.[63] This Court has also determined that a 10% downward adjustment of the lodestar

---

[62] Plaintiffs did prevail on their unpaid wages claim for their last two weeks of employment. However, Plaintiffs asserted other claims (which were barely mentioned at trial) for alleged additional unpaid wages.

[63] This includes 10.4 hours staff; 24.8 hours for services rendered by Plaintiffs' Counsel; and 2.10 hours for services rendered by Gaffney, Lewis, & Edwards, LLC.

fee is appropriate in this case. Accordingly, the Court will award attorneys' fees to Plaintiffs, as prevailing parties, in the sum of $8,572.50.

Section 216(b) of the FLSA also provides for an award of costs. The affidavit submitted by Plaintiffs' Counsel lists the following costs totaling $749.17: $10.80 Pacer charges; $533.76 court reporter deposition cost (excludes transcript); $11.78 certified mail; $4.16 in postage; $150.00 state court filing fee; $6.67 certified mail; and $32.00 in printing costs. The Court finds the presentation of these costs to be fair, just, and reasonable.

## IV.      CONCLUSION

For the foregoing reasons, the Clerk shall enter judgment in favor of Plaintiff Tawanda Taylor-White in the sum of $13,540.25,[64] and in favor of Plaintiff Bernard Ceasar in the sum of $20,991.25.[65]

To the extent any other claims asserted are not addressed in this Order, they are denied for the failure to meet the applicable burden of proof.

Plaintiffs' Counsel, is hereby awarded attorneys' fees and costs in the sum of $9,321.67.

IT IS SO ORDERED.

May 10, 2019                                    Joseph F. Anderson, Jr.
Columbia, South Carolina                        United States District Judge

---

[64] This figure consists of: $1,636.25 for unpaid wages; $5,952.00 for unpaid overtime compensation; $5,952.00 for liquidated damages in an amount equal to unpaid overtime compensation.
[65] This figure consists of: $1,618.45 for unpaid wages; $9,686.40 for unpaid overtime compensation; $9,686.40 for liquidated damages in an amount equal to unpaid overtime compensation.